**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEY WEST POLICE & FIRE PENSION FUND, on behalf of itself and all others similarly situated,<br><br>_____Plaintiff,<br><br>_____v.<br><br>DENTSPLY SIRONA INC., DONALD M. CASEY, JR., JORGE M. GOMEZ, NEERAJ GUNSAGAR, SIMON D. CAMPION, GLENN G. COLEMAN, and ANDREAS G. FRANK,<br><br>_____Defendants. | Case No. 24-cv-9819<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Key West Police & Fire Pension Fund ("Key West P&F" or "Plaintiff"), by through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, _inter alia_, the investigation of its counsel, which included review and analysis of: (i) regulatory filings made by Dentsply Sirona Inc. ("Dentsply" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning Dentsply; and (iv) other public information regarding the Company.

## INTRODUCTION

1.     This securities class action is brought on behalf of all purchasers of Dentsply common stock between May 6, 2021, and November 6, 2024, inclusive (the "Class Period"). The claims asserted herein are alleged against Dentsply and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    Dentsply is the world's largest manufacturer of professional dental products and technologies, conducting business in over 120 countries.  The Company supplies dental practitioners with a wide range of dental equipment, from high-tech imaging systems to tooth whiteners and topical fluoride.

3.    On December 31, 2020, before the Class Period began, Dentsply acquired Byte LLC ("Byte"), a direct-to-consumer clear aligner company, for $1.04 billion.  When Dentsply announced the purchase of Byte on January 4, 2021, it described Byte's business model as "built on doctor-directed care that provides excellent outcomes for patients with mild to moderate orthodontic needs."  Thereafter, Byte operated as a subsidiary of Dentsply.

4.    Throughout the Class Period, Defendants represented to investors that Byte was "very, very customer focused" and that customer satisfaction scores were "high" and "improving." Defendants also represented that Byte customers were overseen by an "expansive nationwide network of independent licensed dentists and orthodontists" to ensure compliance with the rules and regulations pertaining to dentistry.  Finally, the Company also claimed that a "focused funnel" of targeted potential customers led to high rates of conversion to paying customers.

5.    These representations were materially false or misleading.  In truth, Byte aligners had been causing serious injuries to patients since at least May 2021.  Furthermore, Byte did not have a system in place to report these injuries to the Food and Drug Administration ("FDA"), despite being required to do so within 30 days of learning of them.  Finally, rather than a "focused funnel" of high-quality potential customers, sales employees and overseeing dentists were

incentivized to enroll "contraindicated" patients who were medically ineligible for Byte treatment, improperly driving up conversion rates.

6.      These facts began to emerge on October 24, 2024, Dentsply announced that it was suspending the sale and marketing of Byte Aligner Systems and Impression Kits "while the Company conducts a review of certain regulatory requirements related to these products."   The Company further announced that it expected to record a goodwill impairment of $450 to $550 million.  In response to these disclosures, Dentsply common stock declined by $1.10 per share, or 4.5%.

7.      Then, on November 7, 2024, Dentsply adjusted its earnings per share ("EPS") outlook downwards by approximately 8%, due in part to the suspension of Byte.  The Company told investors that it was not in a position to make a decision concerning Byte but was considering discontinuing some or all of the Byte business.  Dentsply also confirmed an impairment to goodwill of $495 million in relation to Byte.  Additionally, Dentsply's Chief Executive Officer ("CEO"), Defendant Simon D. Campion ("Campion"), stated that Byte was one of a few "significant hurdles" to achieving the Company's long-term EPS targets.  These disclosures caused Dentsply common stock to decline by $6.72 per share, or more than 28%.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Dentsply common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.

§ 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.    Venue is proper in this District under 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  Dentsply's common stock trades on the NASDAQ, which is headquartered in this District.

11.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.    Plaintiff Key West P&F is a public pension fund for the benefit of active and retired police officers and firefighters of the City of Key West, Florida.  As indicated in the certification submitted herewith, Plaintiff purchased shares of Dentsply common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

13.    Defendant Dentsply is a manufacturer of professional dental products and technologies.  Dentsply common stock trades on NASDAQ under the ticker symbol "XRAY."  As of October 18, 2024, Dentsply had over 198 million shares of common stock outstanding, owned by hundreds or thousands of investors.

14.    Defendant Donald M. Casey, Jr. ("Casey") served as Dentsply's CEO and Director from February 2018 to April 19, 2022.

15.     Defendant Jorge M. Gomez ("Gomez") served as Executive Vice President and Chief Financial Officer ("CFO") of Dentsply from August 2019 to May 6, 2022.

16.     Defendant Neeraj Gunsagar ("Gunsagar") served as CEO of Byte from July 2019 to August 2022.

17.     Defendant Campion has served as Dentsply's CEO, President and Director since September 2022.

18.     Defendant Glenn G. Coleman ("Coleman") served as Dentsply's CFO and Executive Vice President from September 2022 to November 7, 2024.

19.     Defendant Andreas G. Frank ("Frank") has served as Dentsply's Chief Business Officer and Executive Vice President since April 2022.

20.     Defendants Casey, Gomez, Gunsagar, Campion, Coleman, and Frank are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with Dentsply, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

**BACKGROUND**

21.    Dentsply is a manufacturer of dental products and technology.  It produces a wide array of dental supplies, ranging from anesthetics, plaque and gum disease prevention, tooth polishers, and artificial teeth.  On December 31, 2020, Dentsply purchased 100% of outstanding interests in Byte and its parent company, Straight Smile, LLC for $1.04 billion in cash.  In a press release announcing the purchase, Dentsply described Byte as a "leading direct-to-consumer, doctor-directed clear aligner company."  Clear aligners are orthodontic devices similar to braces, made of transparent plastic.

22.    The Byte business model was to first send a prospective customer an impression kit, which allowed customers to take molds of their teeth at home.  The customer would then send these impressions back to Byte for analysis.  Based on these impressions, Byte developed a treatment plan and made and delivered several sets of clear aligners which the customer would wear to gradually shift that customer's teeth towards the desired outcome.  While most traditional clear aligners like Invisalign or Dentsply's comparable product, SureSmile, involve patients going to a dentist's office for an initial assessment and regular monitoring, Byte required no such visits.  Instead, Byte claimed that its treatment planning was overseen "by [a] network of licensed dentists and orthodontists."  This convenience was valued by some customers, as was the price point, which was significantly lower than comparable in-office treatments.  Because of this, Byte serviced "a patient population historically prohibited proper oral care due to high costs."

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
CAUSE SUBSTANTIAL LOSSES TO INVESTORS**

23.    The Class Period begins on May 6, 2021, when the Company held a conference call to discuss financial results for the first quarter of 2021.  During the call, Defendant Casey spoke on the Company's reasoning behind the acquisition of Byte, stating that Byte had "a really, really

good product."  Casey continued, "They had a great team and culture out there that was very customer focused, and we remain very, very customer focused in terms of those reviews. Literally, something we look at as a team on an hourly and nightly basis."  Casey also stated that it was important to the Company to "maintain high Net Promoter Scores," a market research metric that measures, in part, customer satisfaction.

24.     At the Stifel Jaws & Paws Conference on June 3, 2021, Defendant Gomez touted Byte's ability to collect patient data to enhance patient outcomes: "we have the aggregated data of SureSmile and Byte . . . the more cases you have, the better your library and the better the outcomes for use by the product because the artificial intelligence behind this product is able to simulate more cases. And so, makes the treatment plans faster and more importantly, more accurate."

25.     On September 23, 2021, Dentsply hosted a business update call with analysts.  On that conference call, Defendant Gunsagar, praised Byte's "top rated experience" and stated that Byte "spend[s] a tremendous amount of time making sure that the consumers that are going through our experience are having the best possible experience and that has been at record numbers this year, and we're continuing to invest to make sure that those experiences go all the way through the retainers."  Defendant Casey concurred, "the biggest differentiator in Byte is the patient experience."

26.     On March 1, 2022, Dentsply filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2021.  In the 10-K, the Company explained that while "the Company's Byte aligner business in the U.S. is subject to various state laws, rules and policies which govern the practice of dentistry," it "contracts with an expansive nationwide network of independent licensed dentists and orthodontists for the provision of clinical services, including the oversight and control of each customer's clinical treatment in order to comply with these

regulations and ensure that the business does not violate rules pertaining to the corporate practice of dentistry."

27.    At the Piper Sandler Dental Day on March 29, 2022, Casey again emphasized to analysts the Byte patient experience: "we're pretty excited about if you look at our patient experience and look at some of the things we've been doing with our app and other stuff, we're looking to improve the shape of that funnel by virtue of every single day working to improve the customer experience. And we've made, in my opinion, some really important strides over that in the last couple of months."

28.    Dentsply filed an amendment to its quarterly report on Form 10-Q/A with the SEC on November 7, 2022.  In the 10-Q/A, Dentsply once again stated, "Byte contracts with an expansive nationwide network of independent licensed dentists and orthodontists for the provision of clinical services, including the oversight and control of each customer's clinical treatment."

29.    On January 11, 2023, several Dentsply executives participated in the JP Morgan Healthcare Conference.  During the conference, Defendant Frank discussed "patient compliance and patient experience."  He stated, "our new Byte app [ ] drives significantly closer engagement with the patients throughout their treatment, leads to higher compliance, leads to higher net promoter scores that we can track and measure as one of our KPIs."

30.    On February 28, 2023, Dentsply held an earnings call with investors and analysts to discuss the Company's financial results for the fourth quarter of 2022.  During this earnings call, Defendant Coleman claimed that "despite slowing consumer spending trends," Byte saw strong growth due to "improvement in customer conversion rates."  Defendant Campion stated that Byte was "a meaningful part of our portfolio" and that Dentsply was focusing on "driving customer acquisition, customer conversion and trying to increase customer satisfaction scores."

31.     On March 1, 2023, Dentsply filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2022.  In the 10-K, the Company once again stated that Byte "contracts with an expansive nationwide network of independent licensed dentists and orthodontists for the provision of clinical services, including the oversight and control of each customer's clinical treatment in order to comply with these regulations and ensure that the business does not violate rules pertaining to the corporate practice of dentistry."

32.     Dentsply held its earnings call for the first quarter of 2023 on May 3, 2023.  During this call, Defendant Coleman claimed that "higher customer conversion rates" were driving "strong growth" for Byte, "despite slowing consumer spending trends."  Coleman continued, "the most important thing is really looking at the quality of the funnel and how we're targeting customers. And we're seeing an increase in our overall customer conversion rates, which really helped to reduce customer acquisition costs and drive increased profitability."  He added, "I think we're doing a much better job of targeting customers and driving better customer conversion rates." During this call, Defendant Campion also stated that "we have been passing or rolling through an improved process at Byte in relation to customer acquisition, ensuring that the customers that we are bringing into the funnel are more likely than in the past to end up ordering aligners."

33.     On May 10, 2023, Defendant Campion participated in a question-and-answer session with a Bank of America analyst during the Bank of America Securities Healthcare Conference.  During this exchange, Campion stated that Byte had a "really strong quarter, low 30% growth rate for Byte. Great conversion rate."  He also claimed that the Byte "funnel is smaller but it's a higher quality funnel, as a result of the ton of the work that the team in Salt Lake City has done. So our conversion rates have gone up."  Campion further stated that "the Byte Plus app has increased our net promoter score meaningfully over the past six months."

34.    On June 1, 2023, Dentsply executives returned to Stifel's Jaws & Paws Conference, where Campion claimed that Byte had "streamlined how we how we run that business in the sense of we have a more focused funnel."  He continued, "We validate customers as they enter the funnel. So we don't spend money sending an impression kit to a customer who is not likely to actually purchase. We've changed incentive plans."

35.    On August 3, 2023, Dentsply held its earnings call with analysts and investors to discuss the Company's financial results for the second quarter of 2023.  On the call, Defendant Coleman stated that "Byte grew high-single digits, driven by improved customer conversion rates and lower customer acquisition costs."  Campion followed up: "Byte continues to deliver top line growth and enhanced operational performance with higher customer conversion rates, effective patient engagement and lower customer acquisition costs."

36.    On November 9, 2023, Dentsply hosted a virtual "Investor Day" for analysts and investors.  On this conference call, Campion claimed that Dentsply was "investing in the patient experience with our SureSmile and Byte aligners."  Frank stated that the "Byte business has changed its marketing strategy to focus on specific target demographics, which has resulted in more than 20% higher customer conversion rates year-to-date versus last year." Defendant Coleman explained that a customer conversion occurs when "you send an impression kit to a customer [and] you get it back and actually convert it to a sale."  He continued, "[t]hat percent going up is a big deal from a revenue perspective, but also a profitability perspective because it drives cost of customer acquisition way down.  So that's one thing and we've seen a really nice improvement."  On this conference call, Frank also claimed that adoption of the Byte app has led to "a significant improvement in Net Promoter Scores at the point of treatment completion."

37.     On February 29, 2024, Dentsply filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2023.  In the 10-K, the Company once again stated that Byte "contracts with an expansive nationwide network of independent licensed dentists and orthodontists for the provision of clinical services, including the oversight and control of each customer's clinical treatment in order to comply with these regulations and ensure that the business does not violate rules pertaining to the corporate practice of dentistry."

38.     The statements set forth above in paragraphs 23-37 were materially false and misleading, and failed to disclose material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading.  In truth, Byte aligners had been causing serious injuries to patients since at least May 2021, as revealed in backlogged injury reports that the Company filed with the FDA over the course of 2024.  At least part of the problem was that customer service employees and overseeing dentists were incentivized to enroll contraindicated patients who had other dental issues which should have made them ineligible for Byte treatment.  As a result, Defendants' positive statements concerning Byte's customer experience, and the expansive network of dentists overseeing and controlling each customer's treatment, were materially misleading and/or lacked a reasonable basis.  In addition, Dentsply concealed the fact that its high conversion rates were due to sales incentives to enroll contraindicated patients.

## **THE TRUTH EMERGES**

39.     Investors began to learn the truth on October 24, 2024, after the market closed, when Dentsply issued a press release, which was also filed with the SEC on Form 8-K (the "October 24 8-K"), announcing that, in a decision "made in consultation with the FDA," it was suspending the sale and marketing of Byte Aligner System and Impression Kits.  Dentsply also

disclosed that it "expects to record non-cash charges for the impairment of goodwill within the range of $450 - $550 million."

40.     The next day, Dentsply hosted a conference call (the "October 25 Conference Call") with analysts and investors to discuss the Byte business update.  During that call, Defendant Campion discussed the decision to withdraw Byte Aligners from the market, stating that "in connection with our ongoing discussions with FDA, we have determined that our patient onboarding workflow may not provide adequate assurance that certain . . . contraindicated patients do not enter treatment with Byte Aligners."  Campion also stated, "[f]rom a macro perspective, the state regulatory environment has adversely impacted our Byte Aligner business model.  As a result, we've seen declining conversion rates and new documentation records and additional requirements, such as evidence of visits to a dentist or patient x-rays."

41.     Even while disclosing this news, Dentsply misrepresented its severity.  For instance, in the October 24 8-K, Dentsply initially framed the suspension of sales and marketing of Byte Aligners as a "precautionary measure" that would only last "while the Company conducts a review of certain regulatory requirements."  Then, on the October 25 Conference Call, Campion claimed that "Dentsply Sirona holds itself to the highest standards of quality and compliance with patient safety at the center of everything we do" and that "[c]onsistent with that commitment, we have proactively taken steps to continuously improve our post-market surveillance processes.  One way, we do this is through the company's operating model, which includes retrospective analysis and reporting."

42.     Analysts saw the news of the sales and marketing suspension as negative, but Defendants' misleading assurances mitigated the impact of those disclosures.  For example, an analyst at Leerink Partners wrote, "[i]t is never a 'good' news day when a company has to pull a

product from the market. But in the grand scheme of potential events for XRAY, we think that the overall dynamic of today's Byte news and generally decent pre-announcement (vs. very low expectations) isn't necessarily terrible." An analyst at Evercore ISI believed that "FY24 EPS may fall ~4-6c below our current estimate of $1.96."

43.    As a result of these disclosures, the price of Dentsply common stock declined by $1.10 per share, or 4.5%, from a closing price of $24.41 per share on October 24, 2024, to a closing price of $23.31 per share on October 25, 2024.

44.    Before the markets opened on November 7, 2024, Dentsply reported its financial results for the third quarter of 2024. The Company announced a revised outlook for 2024 of "adjusted EPS of $1.82 to $1.86 (previously $1.96 to $2.02)" and an "impairment of goodwill of ($495) million net of tax" to the Orthodontic and Implant Solutions segment, which contains Byte. Dentsply explained that it was revising its 2024 outlook "due to market pressures impacting U.S. equipment, legislative changes affecting the direct-to-consumer aligner business model, and the voluntary suspension of sales, marketing, and shipments of Byte Aligners and Impression Kits." The Company explained "[t]he outlook does not include potential adjustments or impacts of additional Byte remediation measures or decisions made by the Company."

45.    Dentsply held an earnings call later that day, where senior executives elaborated on the third quarter results. Defendant Campion explained that even before the suspension of sales, "[r]educed conversion rates for Byte drove a sequential double-digit decline." Defendant Coleman stated that "Byte, our direct-to-consumer aligner brand, declined 7% year-over-year and 19% sequentially, primarily due to lower conversion rates and other adverse impacts from legislative challenges in certain states." Campion also cast doubts on Dentsply's long-term prospects, stating "I think the obvious question many of you will have surrounds our original $3 adjusted EPS target

for 2026. Clearly, the macro and other pressures, like Byte, have created significant hurdles to achieving this target."

46.     Defendant Campion also discussed the future of Byte during this conference call. He stated that the Company was "not at a point in our analysis to make a definitive decision concerning Byte and we are thoroughly evaluating strategic options, which may include a discontinuation of some or all of [this] business."  In response to a question on how long the suspension might last, Campion responded that the Company had already "taken very fast action on the cost side" and "informed the . . . relevant employees that their jobs will be ceasing to exist." Later in the call, an analyst wondered if Campion's response meant that Byte Aligners would be permanently off the market, stating "I mean, effectively, it sounds like you're telling us you're just shutting down the business without just saying you're shutting down the business."

47.     The market was shocked.  "Tough day," wrote an analyst for Evercore ISI, "[t]oday's update to both shorter-term dynamics in the channel and the 2025 financial implications from the Byte suspension (which we are assuming will be permanent), have complicated the outlook for XRAY."  An analyst at Leerink Partners wrote that "[u]nknowns [are] piling up" and that Leerink's "previous view had been that the company has numerous levers to sustain profit growth.  With ongoing growth challenges, the Byte suspension (we have removed Byte from our model for now), and what remains a choppy market, we find it hard to remain constructive until we see better data points."  An analyst for Piper Sandler wrote that the day's news had analysts asking, "'is this the bottom?' or 'will it get worse?'".

48.     As a result of these disclosures, the price of Dentsply common stock declined by $6.72 per share, or more than 28%, from a closing price of $23.98 per share on November 6, 2024, to a closing price of $17.26 per share on November 7, 2024.

**LOSS CAUSATION**

49.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

50.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Dentsply common stock and operated as a fraud or deceit on the Class (defined below).  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Dentsply common stock declined significantly as the prior artificial inflation came out of the price over time.  As a result of their purchases of Dentsply shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

51.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all purchasers of Dentsply common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Dentsply and their families and affiliates.

52.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of October 18, 2024, Dentsply had over 198 million shares of common stock outstanding, owned by hundreds or thousands of investors.

53.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Dentsply common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damages sustained by Class members and the appropriate measure of damages.

54.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

55.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

56.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

57.    To the extent that any of the alleged false statements described in this Complaint were forward-looking, Dentsply "Safe Harbor" warnings accompanying any purportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

58.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false or misleading forward-looking statements because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Dentsply who knew the statement was false or misleading.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or statements of future economic performance made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

59.    At all relevant times, the market for Dentsply common stock was an efficient market for the following reasons, among others:

(a)    Dentsply common stock met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Dentsply filed periodic public reports with the SEC and NASDAQ;

17

(c)     Dentsply regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Dentsply was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

60.    As a result of the foregoing, the market for Dentsply common stock promptly digested current information regarding Dentsply from all publicly available sources and reflected such information in the price of Dentsply common stock.   Under these circumstances, all purchasers of Dentsply common stock during the Class Period suffered similar injury through their purchases of Dentsply common stock at artificially inflated prices and the presumption of reliance applies.

61.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves a failure to disclose material adverse information regarding Dentsply's business and operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Byte to the overall Company and the impact that its suspension and

potential discontinuation could have on the Company's near-term and long-term financial condition, that requirement is satisfied here.

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

62.    Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

63.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Dentsply common stock at artificially inflated prices.

64.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Dentsply common stock in an effort to maintain artificially high market prices for Dentsply common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

65.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce, and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

66.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Dentsply's true condition from the investing public and to support the artificially inflated prices of Dentsply common stock.

68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Dentsply common stock.  Plaintiff and the Class would not have purchased Dentsply common stock at the prices they paid, or at all, had they been aware that the market prices for Dentsply common stock had been artificially inflated by Defendants' fraudulent course of conduct.

69.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Dentsply common stock during the Class Period.

70.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

71.     Plaintiff repeats, incorporates, and realleges each and every allegation contained above as if fully set forth herein.

72.     The Individual Defendants acted as controlling persons of Dentsply within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-

20

day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Dentsply, the Individual Defendants had the power and ability to control the actions of Dentsply and its employees. By reason of this conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: December 19, 2024                    Respectfully submitted,

*/s/ Hannah Ross*
Hannah Ross
Avi Josefson
Scott R. Foglietta
**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020

Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff Key West Police & Fire Pension Fund*

Robert D. Klausner
**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

*Additional Counsel for Plaintiff Key West Police & Fire Pension Fund*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Terry Garcia, on behalf of Key West Police & Fire Pension Fund ("Key West P&F"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Key West P&F. I have reviewed the complaint with Key West P&F's legal counsel. Based on legal counsel's knowledge and advice, Key West P&F has authorized the filing of the complaint.

2. Key West P&F did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Key West P&F is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Key West P&F's transactions in the Dentsply Sirona Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Key West P&F is currently serving as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Schneider v. Natera, Inc.*, No. 22-cv-398 (W.D. Tex.)

6. Key West P&F will not accept any payment for serving as a representative party on behalf of the class beyond Key West P&F's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ day of December, 2024.

Terry Garcia
Chairman
*Key West Police & Fire Pension Fund*

**Key West Police & Fire Pension Fund**
**Transactions in Dentsply Sirona Inc.**

| <u>Transaction</u> | <u>Date</u> | <u>Shares</u> | <u>Price</u> |
|---|---|---|---|
| Purchase | 1/10/2023 | 1,002 | 33.092500 |
| Purchase | 1/10/2023 | 2,807 | 33.283900 |
| Purchase | 1/11/2023 | 731 | 34.820100 |
| Purchase | 2/2/2023 | 6,690 | 39.620900 |
| Purchase | 3/10/2023 | 535 | 36.996900 |
| Purchase | 11/1/2023 | 800 | 30.365400 |
| Purchase | 12/15/2023 | 180 | 34.456100 |
| | | | |
| Sale | 7/22/2024 | (6,870) | 26.329000 |